State vs. Comptoir National D'Escompte de Paris.

## No. 13,117.

STATE OF LOUISIANA VS. COMPTOIR NATIONAL D'ESCOMPTE DE PARIS; ALBERT BRETON, AGENT.

### SYLLABUS.

1. The contemporaneous construction of a statute by those charged with its execution should not be disregarded except for cogent reasons and unless it be clear that such construction was erroneous; and particularly is this true when the changed construction operates retroactively and imposes, upon citizens or corporations, charges or exactions, for doing business to which they were not subjected under the construction which obtained when such business was entered into and whilst it was being conducted.

2. The construction which equity would favor may be adopted by a court of law, in construing a statute, if two constructions are fairly possible.

3. The words: "That for each business of carrying on a bank, banking company, association, corporation or agency," as used in the License Law (Act 150) of 1890, having, for a number of years, been construed by those charged with its execution as not entitling the State to exact a license for "the business of carrying on a bank," etc., from an agency, in New Orleans, of a foreign bank, where such agency received no deposits and discounted no commercial paper, but confined its business to making advances on cotton and grain *en route* to Europe and to the dealing in exchange incidental and necessary to that business, and the General Assembly having, in 1898, imposed a license upon the specific business done by such agency, it would be inequitable, thereafter, to sanction a change in the construction of the Act of 1890, whereby such agency would be required to pay back licenses, with heavy penalties, for "the business of carrying on a bank," etc., during the years when the previous construction obtained.

ON APPEAL from the Civil District Court for the Parish of Orleans. *Rightor, J.*

*E. H. McCaleb, Jr.,* for Plaintiff and Appellant.

*Harry H. Hall* for Defendant and Appellee.

Argued and submitted March 25, 1899.
Opinion handed down April 17, 1899.
Rehearing refused June 12, 1899.

The opinion of the court was delivered by

MONROE, J.   The State Tax Collector for the First District of New Orleans, proceeding by rule, alleges, in substance, that the defendant, the "Comptoir National D'Escompte de Paris; Albert Breton, Agent," carried on, in New Orleans, during the years 1894, 1895, 1896, 1897 and 1898, the business of "a bank, banking company, association, corporation, or agency," within the meaning of the then existing law providing for the payment of a license by any person engaged in business; but that said defendant paid no license, and, hence, that it owes the State $4,500 for its license for each of said years, with interest at two per cent. per month from the respective dates at which it became *delinquent,* and with ten per cent. on said amount and interest, as attorney's fees; the total claim for license being $22,500, and for interest and attorney's fees nearly as much more, making an aggregate of over $42,000.

The proceeding is based upon so much of paragraph 2, Section 3, of Act 150 of 1890, as reads:

"That for each business of carrying on a bank, banking company,
" association, corporation, or agency, the license shall be based on the
" declared, or nominal, capital and surplus, whether said capital and
" surplus is owned, or in use, or on deposit, in this State or elsewhere,
" as follows, to-wit:

"*First Class.* When the said declared or nominal capital and sur-
" plus is five millions of dollars or more, the license shall be four
" thousand five hundred dollars ($4,500)."

The defense, stated in substance, is:

1.   That defendant did no business in New Orleans in 1894.

2.   That the business done by it in 1895, 1896, 1897 and 1898, was not a banking business within the contemplation of the statute relied on, and was not so considered, during those years, by the officers of the State, whose duty it was to construe and enforce said statute, and that the State should be estopped, at this time, and for the purposes of this suit, to place a construction on said statute different from that which obtained when defendant embarked in, and carried on, its said business.

3.   That the business carried on by defendant was that of inter-state and foreign commerce, and that the act relied on, if construed to require a license therefor, violates the "Commerce" clause of the Constitution of the United States.

4.   Defendant further alleges that for the business carried on by it during the years mentioned, it paid a license on the business pursuit known as "brokerage in money, stocks, bonds, etc."

The facts, as disclosed by the record, are:

That defendant did no business in New Orleans in 1894.

That, in 1895, Albert Breton came here as the agent of the "Comptoir National D'Escompte de Paris," a corporation established by the French government, for general banking and financiering purposes, with a capital, including its reserve, of more than 100,000,000 francs, and which has its principal office in Paris, and that, as such agent, he entered into, and has been engaged in, business in this city since that time.

The business thus carried on, as appears from the record, was confined to transactions of the following character:

Persons purchasing cotton, or other agricultural products, for shipment abroad, draw bills of exchange to which are attached bills of lading of the products shipped.   In order, however, to obtain actual money with which to pay the purchase price of such products, it is necessary to negotiate those bills of exchange, and part of the business done by the defendant is to buy them—with the bills of lading attached.

In some cases, and, apparently, not unfrequently, the cotton (and the word "cotton" may stand for other agricultural products for the purposes of this opinion), is purchased in the interior—in Mississippi, Texas, Arkansas, Alabama, Indian Territory, Oklahoma, or elsewhere, for shipment to Great Britain or the continent of Europe, via New Orleans, and the money to pay the purchase price is advanced upon the arrival of the bills of lading and their transfer to the defendant here in New Orleans, such security being thereafter replaced by the bills of exchange drawn upon the ultimate consignees abroad, with the ship's bill of lading attached, as in case of an original shipment from here.

In order to procure the money to transact this business, the defendant sells, in New York, drafts on London, Paris, Germany, or wherever they can be drawn to best advantage, and then, to transfer to New

Orleans, when it is needed, the money thus realized in New York, defendant sells, in New Orleans, its drafts on New York against said money which is there deposited to its credit.

Defendant receives no deposits in New Orleans and accumulates no funds here, save in the manner, and for the purposes, as thus stated. It makes no discounts of ordinary commercial paper, and lends no money upon mortgage or other security save cotton or grain which is *en route* to foreign countries, and the bills of lading for which are transferred to it. And, the business thus described appears to have been the business contemplated when the agency was established here in 1895.

It also appears that defendant's agent, before entering upon said business, sought information from those sources most likely to afford it, as to the conditions upon which it could be conducted. He was advised by counsel that the law imposed no license upon it, and we do not understand the tax collector, plaintiff, in rule, to deny, in his testimony, the statement of defendant's agent, that he too informed him that the law imposed no license for the business which defendant proposed to carry on. Certain it is that no effort was made during the years 1895, 1896, 1897, to collect any other license than that which defendant voluntarily paid. When the General Assembly convened in 1898, it appears to have been the common belief and understanding that the Constitution which had just been adopted, taken in connection with certain recent decisions of the Supreme Court of the United States, opened the way for the taxation of foreign corporations, such as defendant, which had before that time been considered, *quoad* the business in which they were engaged, non taxable by the State. Mr. Parker, who is the tax collector, and plaintiff in rule, in testifying, and in referring to the act under which he brings this proceeding, says (R. 34): " * * * Now, for several years past, I " have been in doubt about the constitutionality of this act in regard " to foreign corporations, and there has been a great deal of litigation " in regard to it. Since the decision of the Supreme Court of the " United States, in an Ohio case, and other cases, where this question " was brought up, I found that the State has a perfect right to demand " a license from such corporations. In the meantime the constitu- " tional convention had been called. The matter of taxing foreign " banks was called to the attention of the Constitutional Convention; " that is, taxing foreign banks that came here and transacted business.

"They do a large business, and local banks had to pay twelve or fifteen thousand dollors a year for taxes, whereas foreign banks only paid two or three thousand dollars. I appeared before the legislative committee upon the part of the local banks, and made a statement in regard, to the constitutionality of the act as it existed before; but stated that I had nothing to do with that act, and all those things were matters of law."

Mr. Trezevant, chairman of the Committee on Ways and Means in the General Assembly of 1898, testifies:

That a bill was introduced and passed for the purpose of taxing foreign banks; that said bill was passed upon the assumption that there was no anterior legislation which accomplished that purpose; that it was the unanimous opinion of the Ways and Means Committee that said bill, as passed, and as it now stands upon the statute books, imposes a fair license tax upon the "Comptoir National D'Escompte de Paris"; and that said bill came from the State Auditor, and that Mr. Parker, plaintiff in the present rule, and State Tax Collector, was consulted in its preparation and favored its passage. He further says:

"That legislation grew out of the fact that the Constitutional Convention had provided for a manner of taxing foreign banks and foreign citizens. And this bill was intended to reach what the State had not heretofore been able to reach for taxes."

The bill appears as Act No. 127 in the Acts of 1898, and is entitled, "An act to levy an annual license tax upon certain classes of corporations doing business within the State, whose domiciles are in other States, or foreign countries, under Article 243 of the Constitution." The first and second sections read thus:

"Section 1. Be it enacted, etc., That there is hereby levied an annual license tax for the year 1899, and for each subsequent year, under Article 243 of the Constitution, upon corporations doing business in this State, but domiciled in other States of the Union or in foreign countries, as follows:

"Sec. 2. Be it further enacted, etc., That all banks, banking associations, corporations, or companies, who may in their own name, or in the name of their agents, or representatives, engage in this State in the business of lending money, or dealing in exchange, shall pay a license of two and one-half per cent. on the gross profits of all money loaned, and all exchange bought, and all exchange sold, and all other

" business done; *provided,* no license shall issue as provided for in this
" section for less than one thousand dollars; *provided* that the mini-
" mum license of one thousand dollars shall not apply to those com-
" panies or corporations lending money, secured solely by mortgage or
" real estate."

It was not until after the passage of this act, that demand was
made, for the first time, upon the defendant, for payment of $4500
for licenses as a bank, under the act of 1890, for each of the years '94,
'95, '96, '97 and '98, and with that demand, made in September, 1898,
came also, the demand for the payment of interest at 2% per month
from May 1st of said years respectively, and 10% as attorney's fees,
upon the aggregate amount of licenses and interest.

These being the facts presented by the record, it must be admitted
that the claim sought to be enforced, if legal, is certainly inequitable.
The defendant came here not for the purpose of engaging in a "bank-
:ng business," as that expression is commonly understood, but to en-
gage in the particular business which has been described. Before
entering into it, however, reasonable and prudent inquiry was made
as to the conditions under which it could be conducted. Legal advice
was obtained to the effect that the State imposed no license. Beyond
that, where was the defendant to go for information? The law ap-
plicable to the subject had been on the statute books for about five
years, during which time, it had been, primarily, interpreted and en-
forced by those officers of the executive department of the government
particularly charged with that duty. They knew whether it had ever
been applied to a case such as that of the defendant, and if no such
case had presented itself it was for them to determine, primarily,
whether it was intended to be, and should be, so applied or not. The
defendant submitted its case to the particular officer whose duty it
was. to require the payment of the license imposed by law—the only
officer to whom such application could be made. And that officer, the
plaintiff herein, whose diligence and vigilance is unquestioned, was
of opinion then, as he was of opinion in 1898, when he appeared before
the legislative committee, that no license was imposed by law upon the
business in which the defendant was about to engage.

From the evidence in the record it may also be fairly inferred that
the State Auditor entertained similar views, and regulated his official
action accordingly.

So much for the executive department speaking through the officers.

particularly charged with the interpretation and execution of the law now sought to be enforced.

The legislative department took no action upon the question at issue from the adoption of the statute of 1890 until 1898, when a statute was adopted applying in specific terms to the particular business in which the defendant was, and is, engaged.

If, in the meanwhile, any action was taken upon the subject by the judiciary, it has not been called to our attention.

After the adoption of the act of 1898, however, the defendant, having conducted its business during the years '95, '96, '97 and '98, in the belief that no license was required for such business, (although a broker's license had been paid, apparently upon the theory that something was due for the privilege of doing business even though the law might not require it), this action was instituted, and the defendant is called upon to pay not only the $4500 now said to have been due, as a license, for each of those years, but interest and attorney's fees—which for the year '95, bring the amount claimed for that year up to the sum of $9700, and bring the total claim, as has been stated, up to over $42,000.  The license here claimed, it will be observed, is not predicated upon the amount of business done, or profits earned, but upon the whole capital of the defendant whether used in this state or elsewhere, and if the theory propounded by the plaintiff be correct, the defendant is liable for the large amount demanded, even though its business should have proved unprofitable.  The Supreme Court of the United States, long since, said in regard to the law of contracts:

"The sound and true rule is, that if the contract, when made, is valid by the law of the State as then expounded by all departments of the government and administered in its courts of justice, its validity and obligation can not be impaired by any subsequent action of the Legislature or decision of its courts altering the construction of the law."   Levy vs. Hitsche, 40th Ann., 500; Ohio Life Insurance and Trust Co. vs. Debolt, 16th How., 432; Gelpecke vs. City of Dubuque, 1st Wall., 175.

This rule, it may be said, is not literally applicable to a case where no question of contract is involved, and where it does not appear that the law relied on has received judicial construction, nevertheless, there can be little doubt as to the application to such a case of the principle, which underlies the rule, that when an innocent person has partici-

pated in action which is the result of error, he ought not to be mulcted for the benefit of those by whom the error was committed.

In *United States vs. Alabama G. S. R. R. Co., 142 U. S., 615,* suit was brought to recover compensation for carrying the mail over the plaintiff's road. The defense set up was that the government had granted land in aid of the construction of the road and was entitled to mail transportation at a reduced rate. It was admitted that about nine-tenths of the road, lying in Alabama and Mississippi, had been built with the aid of land grants, and that about one-tenth, lying in Tennessee and Georgia, had been constructed without such aid—and the only question was, whether the government was entitled to the reduced rates over the unaided portion. When the contract with the plaintiff was made the law was interpreted by the officers charged with its administration to mean that the government was entitled to the reduced rates only over the aided portion, but there was no action by the judiciary. When the plaintiff demanded its pay it was informed that the law was differently interpreted and that it must accept reduced rates over the whole line.

The Supreme Court said, referring to the construction first placed upon the statute:

"This was the construction given to it by the Postmaster General and by the accounting officers of the Treasury at the time the act was passed, and the Alabama and Chattanooga R. R. Co., and its successor, the appellee, was, and continued to be, paid upon that basis from 1876 to 1885, by six postmasters general, when in 1885, the then incumbent of the office reversed the rulings of his predecessors, and not only subjected the entire line to the reduced rates, but made such construction retroactive, and enforced repayment of what the road had for nine years received under the prior construction."

"We think the contemporaneous construction thus given by the executive department of the government and continued for nine years through six different administrations of that department—a construction which though inconsistent with the literalism of the act, certainly consorts with the equities of the case—should be considered as decisive in this suit. It is a settled doctrine of this court that, in case of ambiguity, the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby par-

ties who have contracted with the government upon the faith of such construction may be prejudiced. It is especially objectionable that a construction of a statute favorable to the individual citizen should be changed in such manner as to become retroactive, and to require from him the repayment of moneys to which he had supposed himself entitled, and upon the expectation of which he had made his contracts with the government. These principles were announced as early as 1827, in Edwards vs. Darby, 12, Wheat 206, and have been steadily adhered to in subsequent decisions." (Citing them).

The case of United States vs. Johnson, 124 U. S., 236, was one in which there was a difference between the government and a special agent of the Treasury in regard to his charges, upon certain abandoned cotton which came into his hands in his official capacity, and the court sustained the charges on the ground that they were justified under the construction of the law, (placed upon it by the officers charged with its administration), which obtained at the time they were made. Mr. Justice Harlan, in deciding the case, mentions the fact that whilst Mr. Chase was Secretary of the Treasury, and afterwards, the proceeds of abandoned property was "merely deposited" with the Treasurer, but was not considered as "*covered* into the Treasury*," or as subject to the Constitutional provision that no money shall be drawn from the Treasury but in consequence of appropriations made by law, and that some million of dollars of such money was paid out without any appropriation, when Congress interposed with a joint resolution covering the case. The learned Justice says:

"The language of this resolution affords some evidence that Congress was aware of the manner in which the several acts in regard to captured and abandoned property had been executed, and did not intend to disturb what had been previously done under the practice prevailing in the treasury department." And—proceeding with the opinion—he says:

"In view of the foregoing facts, the case comes fairly within the rule often announced by this court, that the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is entitled to great weight, and should not be disregarded or overturned except for cogent reasons and unless it be clear that such construction is erroneous."

The same doctrine is announced in Pennoyer vs. McConnaughy, 140th U. S., p. 1; Provident Life & Trust Co. vs. Mercer County,

170th U. S., 593; Washington & Idaho Railroad Company vs. Coeur D'Alene Railway and Navigation Company, 160th U. S., 77, 36th Fla., 519 (29 L. R. A., 507); 88 Me., 49; 149 N. Y., 5 (31 L. R. A., 116, 510) and other cases too numerous to mention. In the case of Washington & Idaho Railroad Company vs. Coeur D'Alene Railway and Navigation Company, 160 U. S., 77, the court said: "When a court of law is construing an instrument, whether a public law or a private contract, it is legitimate, if two constructions are fairly possible, to adopt that one which equity would favor."

In this State it has more than once been held that: "The common interpretation of statutes which has existed for a length of time will be considered, as it generally is, the correct interpretation. *Communis error facit jus.*" Hubgh vs. N. O. & C. R. R. Co., 6th Ann., 496-498; Beck & Co. vs. Brady, Brown & Co., 7th Ann., 1; Union Towboat Company vs. Bordelon, Auditor, 7th Ann., 193; Waldo & Hughes vs. J. M. Bell, 13th Ann., 329.

Applying the doctrine of these cases to the solution of the question under consideration, it might well be that the contemporaneous construction of the act of 1890, under which defendant carried on business from 1895 to 1898, inclusive, without paying the license imposed upon the business of banking, was erroneous, and yet, that the plaintiff would not be entitled to recover the amount here claimed, or any part of it. But it is yet to be ascertained that the contemporaneous construction was erroneous.

"The words of a law are generally to be understood in their most known and popular signification." *State ex rel Charles Bienvenu vs. Wretnowski, 17th Ann., 156;* Fayssoux vs. Denis, 48th Ann., 852.

"The popular or received import of words furnishes the general rule " for the interpretation of public laws, as well as of private and social " transactions." *Maillard vs. Lawrence, 16th, Howard, 251.*

It is argued on behalf of the plaintiff in rule that in the *"strictest commercial sense,"* the terms "Bank," and "Banker," apply to any corporation or person, who does, or who is authorized to do, any one of several things for which banks are considered to be established, and that, therefore, the language of the act of 1890, imposing a license "for each business of carrying on, a bank, banking company," etc., applied, and was intended to apply, to the defendant; not because the defendant did the business most common in banking, and commonly supposed to be an essential part of it, but because the defendant did

some of the business which is done by banks. And the argument is pressed, to the effect that, inasmuch as in the *"strictest commercial sense,"* the terms "Banks," and "Banker," apply to any corporation or individual exercising any single function customary in the banking business, the act of 1890 ought to be applied to defendant if it did no other business than loan money, or did no other business than buy and sell exchange, or if, receiving no deposits and discounting no paper, its business was confined to advancing upon cotton *en route* to Europe and dealing in exchange to the extent necessary for that purpose.

It will hardly be denied that there are many persons, both natural and artificial, who loan money, and make a business of it—and yet who are not commonly considered bankers. Many large corporations, for instance, such as Trust and Guaranty Companies and Insurance Companies are constantly seeking investments for their capital, and the making of loans is a most important part of the business in which they are engaged. Then there are retired capitalists, and capitalists who have not retired, and pawn brokers, and merchants, who loan money, and notaries public through whom loans are effected, but they are not considered bankers, nor are they required to pay license as such. The framers of the United States revenue law (of 1864) seem to have understood the matter, and, in imposing a license tax upon banks and banking, were careful to define, who, for the purposes of that law, should be considered a banker or as engaged in banking, and, from the language of the law, any one who made a loan was liable for a banking license. Even under that statute, however, the Supreme Court of the United States held that "a company loaning its own money and taking bonds and mortgages therefor, and selling the bonds with a guaranty was not a banker." Selden vs. Equitable Trust Company, 94th U. S., 419.

The language of the law which was the subject of construction, was as follows, to-wit.:

"Every incorporated or other bank, and every person, firm or company having a place of business where credits are opened by the deposit or collection of money or currency, subject to be paid or remitted upon draft, check or order; or where money is advanced or loaned on stock, bonds, bullion, bills of exchange or promissory notes; or where stock, bonds, bullion, bills of exchange or promissory notes are received for discount or for sale, shall be regarded as a bank or as a banker." *U. S. Revised Statutes, 3407.*

Mr. Morse, in commenting upon this law and upon the jurispru-dence concerning it, says: "* * * The act does not say a private money lender is a banker, but simply that he shall be taxed as such, probably for the reason that his business is more nearly akin to banking than to anything else. But for purposes of strict legal construction, in all questions arising beyond the control of the pro-visions of this act those arbitrary boundary lines are valueless. A money lender could not have been taxed as a banker in the absence of this express legislation and it was to remedy this that the legislation was deemed necessary." Morse on Banks & Banking, Vol. 1, Sec-tion 4.

And such, apparently, was the situation in Louisiana. The General Assembly in the adoption of the act of 1890, did not have in contem-plation persons or corporations engaged in the peculiar business car-ried on by defendant, and, hence, did not intend that act to apply to them; and, when defendant appeared, in 1895, the officers of the gov-ernment made no attempt to apply to it a law which was inapplicable. But, *because* the existing law was inapplicable, the Statute of 1898 was adopted, imposing a license, not upon the "business of carrying on a bank, banking company," etc., as in the Act of 1890; but, upon "all banks, banking associations * * * who may * * * engage in this State in the business of lending money or dealing in exchanges," etc.

Further commenting upon the Statutes of the United States, Mr. Morse says (Vol. 1, Section 4):

"In construing this statute the Supreme Court of the United States adopt the definition of a banker therein given (Act 1864, Section 79), and say, generally: "Having a place of business where deposits are received and paid out on checks, and where money is loaned on security, is the substance of the business of a banker." (*Warren vs. Shook, 91 U. S., 704.*) It will be observed that the statute uses the disjunctive and the court the conjunctive particle. The Statute says: "where credits are opened by deposits, *or* where money is advanced," etc. The court speaks of the depositing *"and"* loaning. For all gen-eral purposes, beyond the artificial influence of the act, the court is clearly the more correct."

The definition of a bank given by the author himself is as follows: "A bank is an institution, usually incorporated, with power to issue its promissory notes, intended to circulate as money (known as bank

notes), or to receive the money of others, on general deposit, to form a joint fund that shall be used by the institution for its own benefit, for one or more of the purposes of making temporary loans and discounts, of dealing in foreign and domestic bills of exchange, coin, bullion, credits and the remission of money, or with both these powers, and with privileges in addition to these basic powers, of. receiving deposits and making collections for the holders of negotiable paper if the institution sees fit to engage in such business." (*Ibid,* Section 2.)

Any number of definitions might be quoted, and all taken together would convey the idea expressed by the Supreme Court of the United States in *Warren vs. Shook* (*supra*), viz: "Having a place of business where deposits are received and paid out on checks, and where money is loaned on security, is the substance of the business of a banker." No doubt the defendant does, in Paris, the business thus described, and, perhaps, there, and elsewhere, it may do other business besides, but it does not follow that its agent does what is commonly understood to be, or what the Act of 1890 had in contemplation as ,the "business of carrying on a bank," here. He might have been sent to Louisiana to operate a sugar plantation which had fallen into. the hands of the bank, but he would hardly be required to take out a banker's license because his principal is engaged in that business in France. And so, a foreign corporation engaged in the manufacture of cotton goods might establish an agency here for the purchase of the raw material (and the purchase of raw material is certainly a very essential function of such a business), but it would not be claimed that such an agency would be subject to a license imposed upon "manufacturers of cotton goods."

Hence it is that although the peculiar business carried on by defendant in New Orleans may be, in the "strictest commercial sense," or, within the terms of some unfamiliar definition, the "business of a bank," etc., it is more than doubtful whether it can be considered such a business within the commonly understood meaning of that language. It was not so considered, by the officers charged with the execution of the law in which the language is used at any time apparently, from the date of the adoption of the law, in 1890, until the filing of the rule in this case in 1898. In the meanwhile defendant had gone into the business in 1895 and has continued up to the present time, and now—with the Act of 1898, making provision for the future, and serving as a legislative interpretation of the Act of 1890—entirely

FIFTY-FIRST ANNUAL REPORTS, 1899.     1285

consistent with, if not actually based upon, the interpretation which that act had always received, the demand is here made that the Act of 1890 shall receive a totally different interpretation, for the purposes of this suit, and that the new interpretation shall be given a retroactive effect so as to make defendant pay more than forty thousand dollars, which no one, before the filing of this proceeding, had any reason to believe that it owed.   The demand is unreasonable and inequitable. The case should be determined upon the principles enunciated in the judicial opinions hereinbefore quoted.   It was so determined by the learned Judge *a quo,* and the judgment appealed from is accordingly affirmed.