(68 South. 819)

No. 21236.

STATE v. SOUTHERN PAC. CO.

STATE v. UNITED FRUIT CO.

(May 10, 1915.   On Application for Rehearing, June 7, 1915.)

*(Syllabus by Editorial Staff.)*

1. INTOXICATING LIQUORS ⬡53—LICENSES— STATUTORY PROVISIONS—CONSTRUCTION.

Acts 1908, No. 176, providing that for every business of conducting a barroom, cabaret, drinking saloon, or other place where liquors are sold, the license shall be based on the annual gross receipts of the business, and prohibiting the sale of liquors at retail by any person within the state without a license includes barrooms on vessels plying between New Orleans and New York City and points in foreign countries, though the vessels do not touch at any port in the state other than the city of New Orleans, and though no liquor is sold while at the port of New .Orleans, but sales are made while the vessels are in the Mississippi river proceeding on their outward or inward voyages.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. § 54; Dec. Dig. ⬡53.]

2. COMMERCE ⬡14—INTERSTATE COMMERCE— LICENSING SALE OF INTOXICATING LIQUORS —VALIDITY.

The licensing Acts of 1880, No. 119, and 1886, No. 101, continued in force in the subsequent Acts of 1890, No. 150, 1898, No. 171, and 1908, No. 176, purporting to regulate all sales of liquor within the state, are applicable to sales in barrooms on vessels engaged in interstate and foreign commerce, subsequent to the passage of the Wilson Act (Act Aug. 8, 1890, c. 728, 26 Stat. 313 [U. S. Comp. St. 1913, § 8738]), though not applicable prior thereto.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 30, 92; Dec. Dig. ⬡14.]

3. STATUTES ⬡219 — CONSTRUCTION — CONSTRUCTION PLACED ON STATUTES BY PUBLIC OFFICER—EFFECT.

The interpretation placed on a statute by public officers charged with its enforcement will be given great weight by the courts, especially when acquiesced in for many years.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 296, 297; Dec. Dig. ⬡219.]

4. STATUTES ⬡219 — CONSTRUCTION — CONSTRUCTION PLACED ON STATUTES BY PUBLIC OFFICER—EFFECT.

The rule that the interpretation put on a statute by public officers charged with its enforcement will be given great weight by the courts does not apply to the construction of

Acts 1908, No. 176, licensing the sale of intoxicating liquor, as to whether it includes barrooms on vessels engaged in interstate and foreign commerce, where the officers charged with the enforcement of the statute had no knowledge that owners of the vessels were retailing liquors thereon in the state without a license before demand for license was made.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 296, 297; Dec. Dig. ⬡219.]

5. COMMERCE ⬡40—INTERSTATE COMMERCE— LEVYING DUTIES ON COMMERCE.

Acts 1908, No. 176, providing that for every business of conducting a barroom, drinking saloon, or other place where liquors are sold, the license shall be based on the annual gross receipts of the business, though construed to require a license for the sale of liquor on vessels on the Mississippi, engaged in interstate and foreign commerce, is not an interference with interstate commerce or the levying duties on interstate or foreign commerce in violation of Const. U. S. art. 1, § 8, par. 3, and section 9, par. 5.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 29, 30; Dec. Dig. ⬡40.]

6. INTOXICATING LIQUORS ⬡15—LICENSING ACTS—POLICE REGULATIONS.

Acts 1908, No. 176, providing that for every business of conducting a barroom, drinking saloon, or other place where intoxicating liquors are sold, the license shall be based on the annual gross receipts of the business, is a police regulation, and covers the whole territory of the state, including its waters and as a police regulation includes barrooms on vessels on the Mississippi running between New Orleans and ports in sister states and foreign countries.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. §§ 17, 18; Dec. Dig. ⬡15.]

7. INTOXICATING LIQUORS ⬡51—LICENSING ACTS—POLICE REGULATIONS.

Acts 1908, No. 176, providing that for every business of conducting a barroom, beer saloon, drinking saloon, or other place where liquors are sold, the license shall be based on the annual gross receipts of the business, and prohibiting the sale of liquor by any person within the state without a license, requires a license on each vessel having a barroom in which liquor is sold, while the vessel is on the Mississippi river on a voyage between New Orleans and ports in sister states and foreign countries, though the owner does not at any time have all the vessels within the state.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. § 52; Dec. Dig. ⬡51.]

8. LIMITATION OF ACTIONS ⬡58—RECOVERY OF LICENSE TAX.

In the absence of statute to the contrary, prescription begins to run from the date a license for the sale of intoxicating liquors is

due, or, at the latest, from the time it becomes delinquent.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 324–328, 346, 347; Dec. Dig. ⊘=58.]

O'Niell, J., dissenting.

On Application for Rehearing.

9. INTOXICATING LIQUORS ⊘=93—LICENSES— LIENS AND PRIVILEGES FOR COLLECTION— STATUTORY PROVISIONS.

Under Acts 1898, No. 171, § 28, as amended by Acts 1900, No. 131, securing to the state a first mortgage on property for unpaid licenses, and Acts 1908, No. 176, § 13, making all liens and privileges for the collection of licenses applicable to the business of retailing liquor, the state has a first mortgage, lien, and privilege, on the property of one failing to procure a liquor license, as security for the license.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. § 99; Dec. Dig. ⊘=93.]

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Consolidated actions by the State against the Southern Pacific Company and against the United Fruit Company. From a judgment for defendants, the State appeals. Affirmed in part; reversed and rendered in part.

Wm. W. Westerfield, of New Orleans, for the State. Denegre, Leovy & Chaffe and Harry McCall, all of New Orleans, for appellee Southern Pac. Co. Howe, Fenner, Spencer & Cocke, of New Orleans, for appellee United Fruit Co.

PROVOSTY, J. In these two suits, which have been consolidated because presenting identical issues, the state, through the tax collector of the parish of Orleans, seeks to recover of the two defendant corporations a license for each of the years 1911, 1912, 1913, and 1914 for each of the ships of said companies plying between the port of New Orleans and foreign ports, for that the said companies "are now" (December 30, 1914, the date of the filing of the suits) "and have been since January 1, 1911, engaged in the business of operating a bar, selling spirituous, malt, and vinous liquors by the glass or drink in less quantities than five gallons upon each of the said ships within the territorial limits of the state and of the parish of Orleans." The demand includes interest at the rate of 2 per cent. per month on the amount of the licenses from the 1st of March of the year for which the license is alleged to be due; and also 10 per cent. attorneys' fees on the said principal and interest. And the prayer is further that for securing the payment of said debt a first lien and privilege be recognized and enforced upon all the property of the defendants, and that they be enjoined from conducting said barroom business until the said amounts are paid.

The suits are in the summary form, as is authorized by statute in cases of this character.

The ships in question are named in the petition and in the agreed statement of facts. The aggregate amount demanded of the Southern Pacific Company is $5,600, and of the United Fruit Company, $6,400, plus the said interest and attorney's fees.

[1] The license is demanded under section 1 of Act 176, p. 236, of 1908 (known as the Gay-Shattuck Act), which reads, in part, as follows:

"Section 1. Be it enacted by the General Assembly of the State of Louisiana, that hereafter for every business of conducting a barroom, cabaret, coffee house, café, beer saloon, liquor exchange, drinking saloon, grog shop, beer house, beer garden or other place where spirituous, vinous or malt liquors, or intoxicating beverages, bitters or medicinal preparations of any kinds, are sold, directly * * * in quantities of less than five gallons, the license shall be based on the annual gross receipts of said business, as follows; to wit."

The case was tried upon an agreed statement of facts which is, in substance, as follows:

"(1) The defendants are foreign corporations engaged in the business of transporting passengers by water to and from New Orleans to New York City, N. Y., Havana, Cuba, and various points in Central and South America; and dur-

ing the years 1911, 1912, 1913, and 1914, have operated certain steamships between those ports for that purpose; the said ships being the Comus, Momus, Proteus, Antilles, Excelsior, Creole and Chalmette for the Southern Pacific Company, and the Heredia, Atenas, Turrialba, Cartago, Parismina, Abangarez, Marovigne, and Copename for the United Fruit Company.

"(2) For the accommodation of the passengers on said vessels, said companies have maintained and operated a bar on each of said vessels at which spirituous, malt, and vinous liquors were sold by the glass or drink in less quantities than five gallons to such of the passengers thereon as desired same.

"(3) That none of the said vessels touched at any time, in the years aforesaid, at any port in the state of Louisiana other than the city of New Orleans. That no liquor of any kind was sold on any of the said vessels while at the port of New Orleans; but that all sales were made while said vessels were in the middle of the Mississippi river proceeding on their outward or inward voyages, and sales were made on each of said vessels in each of said years while within the territorial limits of the parish of Orleans, state of Louisiana.

"That neither of the said companies, during the years in question, had more than two of its vessels in the Mississippi river at the same time.

"That neither of the said companies has paid in whole or in part the taxes demanded of them in this suit.

"That no license, such as herein demanded, has ever been claimed of the said companies before December, 1914.

"That both defendants, the Southern Pacific Company and the United Fruit Company, paid a license tax as a retail liquor dealer to the United States government at the office of the internal revenue collector at the city of New Orleans upon each bar upon each vessel for each of the years 1911, 1912, 1913, and 1914."

The defendants contend that the said statute has no application to barrooms on ships, such as theirs; and they advance in support of that contention several arguments which we now proceed to consider in regular order.

First, that this nonapplication results from the text itself of the statute, which shows that the barrooms, cabarets, etc., for which a license must be obtained, are such only as have a stationary location.

It will be noted that section 1, hereinabove transcribed, contains a list which apparently includes every known name by which drinking places are commonly designated, and that after giving this list it adds the omnibus clause, "or other place where liquors are sold." Section 8 repeats this list, but omits the omnibus clause; and it provides that for obtaining the license imposed upon those named places a petition shall be presented to the licensing authority, which shall mention under oath the place where the business is to be located. The argument is that this requirement of mention of the place where the business is to be located, and, in fact, the use of the word "place" in the omnibus clause of section 1, indicates that the statute has application only to a business of stationary location, and not to one that is mobile, as on a ship.

The answer to that argument is obvious, and is twofold: First, that the omnibus clause, "or other place where liquors are sold," embraces in its terms the place where defendants sell liquors even if this place be on a ship; and, secondly, that by section 3 of the statute the sale of liquors at retail by any person within the boundaries of the state without a license, is prohibited under penalty of criminal prosecution; and that therefore, if such drinking places only as are of stationary location can obtain a license, the defendants are liable to criminal prosecution for every drink they may sell in their said barrooms. Either, therefore, the defendants must pay the license, or they cannot conduct the business.

By the location of the barroom, cabaret, etc., section 8 means no more than its whereabouts; the purpose of requiring it to be mentioned being, we imagine, merely identification—a purpose which is fully accomplished when the name of the ship upon which the barroom is to be kept is given.

In State v. Boston & Pickwick Clubs, 45 La. Ann. 593, 12 South. 897, 20 L. R. A. 185, where it was contended that a statute similar to the one now under discussion did not apply to social clubs, the court said:

"It is not limited to a license for the business of barroom, etc., but extends to all 'places'

and 'establishments,' selling or 'giving away or otherwise disposing.' "

And in State v. N. O. Chess, Checkers & Whist Club, 116 La. 46, 40 South. 526, the court said:

"We also concur in the opinion of the trial judge that, as decided in the Boston & Pickwick Club Cases, 45 La. Ann. 586, 12 South. 895, 20 L. R. A. 185, the conducting of a social club is not the carrying on of a business, trade, or occupation in the sense of the license statutes of this state. It follows that the defendant has not been 'conducting the business of a drinking saloon or barroom,' as alleged in the rule. In the case cited supra, the court so held as to other social clubs conducted on the same lines, and defendants therein were not adjudged liable to a license tax for carrying on such a business, but for conducting 'an establishment selling or giving away or otherwise disposing of intoxicating liquors.' "

It is next argued that the lawmaker's intention not to include within the category of barrooms for which a license must be paid the barrooms kept on steamboats and ships is indicated by the change in phraseology in the revenue law; that whereas formerly the revenue law mentioned specifically in the list of drinking places upon which a license is imposed "bars kept on steamboats and other water craft" (Acts 14, p. 50, of 1872; 26 of 1878, to be found at page 5 of the volume containing the Acts of 1879; 27, p. 40, of 1879), the later revenue statutes, beginning with Act 119, p. 143, of 1880, have not done so (Acts 4, p. 52, of 1881; 101, p. 181, of 1886; 150, p. 205, of 1890; 171, p. 414, of 1898; 176, p. 236, of 1908).

The answer to that argument is that the object of the change in the phraseology has not been to restrict the statute in its scope, but to extend it—in fact, to make it all-embracing.

In the case of State v. Boston & Pickwick Clubs, 45 La. Ann. 603, 12 South. 901, 20 L. R. A. 185, this court said:

"It is argued that because the license laws under discussion do not contain any such specific provision as the law of 1871 did to the effect 'every clubhouse where spirituous liquors are used, sold or supplied to members or visitors,'

* * * should pay a license, therefore we must conclude that it was the legislative intention to exclude same therefrom; but we take it to be perfectly clear that the language employed in the licensing acts of 1886 and 1890 are equally as clear and strong as that of the act of 1871. For, although the term 'every clubhouse' is omitted, the phraseology employed, to wit, 'the business of barroom, liquor exchange, drinking saloon, or other place where anything to be drunk or eaten on the premises is sold, directly or indirectly,' is equally indicative of the legislative intention to include such clubhouses."

[2] It is next argued that prior to the passage by Congress of the Wilson Act in 1890 the state did not have the power to exact a license from barrooms upon vessels plying between this state and other states, as the doing so would have been interfering with interstate commerce; and that therefore the licensing acts of 1880 and 1886 could not have been intended to have application to barrooms of that kind; and that inasmuch as the phraseology of these acts, which were thus not intended to have application to such barrooms, has been continued in the subsequent acts of 1890, 1898, and 1908, the conclusion is inevitable that the latter acts, too, were not intended to have such application; so that, even conceding that the state has had the power since the passage of the Wilson Act to exact a license from barrooms of that character, she has not yet exercised that power, but has simply continued the previous order of things.

The answer is that the statutes have all along been all-embracing; that, if before the passage of the Wilson Act (U. S. Comp. St. 1913, § 8738) they did not apply to such barrooms as those of defendants, it was not because of any lack of comprehensiveness, but simply because the commerce clause of the federal Constitution stood in the way; and that they exercised full sway, according to their terms, the moment this obstruction was removed.

It is next argued that, if the defendants' vessels are liable to this license because sell-

ing liquors within the boundaries of the state of Louisiana, then if the vessels ran as far up the Mississippi river as St. Louis they would owe a license to every state through which they passed; and that such a thing is inadmissible.

Our answer is that there would, in the first place, be this difference: That the vessel would not in such a case pass through any state, and therefore would never be clearly within the boundaries of any state, as happens to the vessels in question in the present case; and, in the second place, that if in such a voyage they did pass through several states, and these states imposed a license upon them as the state of Louisiana by this statute does, there would be no alternative but to pay the license. The only reason we can think of why they should not, would be that it was an interference with interstate or foreign commerce; but we understand the decision of the Supreme Court of the United States in the case of Foppiano v. Speed, 199 U. S. 501, 26 Sup. Ct. 138, 50 L. Ed. 288, hereinafter referred to, as having decided that point adversely.

The idea of exacting a liquor license from these ships is somewhat startling at first blush, but upon reflection we realize that the incongruousness in the situation results in part from the fact of the Mississippi being so large a body of water—a veritable inland sea—and in part from the temporariness of the sojourn of these ships within our boundaries; and that this element does not control, or alter, the legal situation, which is that the vessels are within the boundaries of the state, and do sell liquors, and by valid statute a license is imposed upon all places within the boundaries of the state where liquors are sold, and all persons who sell liquors without a license are made liable to criminal prosecution. The determinative element in the problem is not the size of the river or the temporariness of the sojourn, or these

two in combination, but the fact that the case in its facts falls squarely within the terms of a valid statute. Apart from the question of interference with interstate commerce, the principle involved in the case of these large ships plying upon this large river and making but a brief stay is the same that would have to be applied to small craft upon the small navigable streams which make a veritable network of the territory of this state; so that if these ships, because selling liquors only when in midstream, were not amenable to the liquor laws of the state, so would not, by parity of reasoning, the small craft plying the numberless small streams of the state while in midstream. It may well be that, in view of the briefness of the stay of these vessels in this state and the small profit they derive from the business, the amount of said license would be prohibitory; but that is a consideration which addresses itself to the Legislature, not to this court.

It is next argued that this court, interpreting former statutes in the cases of State v. Frappart, 31 La. Ann. 340, and State v. Dennie, 51 La. Ann. 608, 25 South. 394, has held the liquor license laws of this state not to be applicable to vessels while in transit. We do not understand the doctrine of the Frappart Case to be so broad as this, but to be simply that the imposition of such a license would be an unwarrantable interference with interstate commerce. This was the interpretation put upon that case by the Supreme Court of the United States in the Foppiano v. Speed Case, 199 U. S. 501, 26 Sup. Ct. 138, 50 L. Ed. 288, in saying that it "was decided * * * before the act of Congress was passed, and is therefore not applicable to the facts of this case." In the Dennie Case the court said:

"In our judgment, a license can be exacted of all retailers of liquor on boats plying exclusively on the streams of this state. We purposely avoid expressing our opinion in cases of the business of barkeeping on boats running to points out of the state."

The court said, also:

"We all know that a barroom on a water craft is similar, as relates to its business, to a barroom on land; and we can conceive of no good reason for holding that one is subject to a license tax, while the other is not, if there is no law exempting either. It is quite true that no occupation is licensed, unless specifically enumerated by law. Here no distinction is made in the statute as relates to the place where the liquor is retailed. It embraces all retailers of liquors."

We do not see what comfort the defendants can derive from these two cases. See State v. McAdams, 106 La. 720–730, 31 South. 187, where the Dennie Case is referred to.

[3, 4] It is next argued that the admission made in the statement of facts, "that no license such as is herein demanded has been claimed of the said two companies before December, 1914," shows what has been the interpretation heretofore put upon the said act of 1908 and prior statutes by the officers charged with the execution of the license tax laws, and that this contemporaneous interpretation should carry great weight with the court, and should not be disregarded unless clearly erroneous; and that, far from being so, it is, on the contrary, clearly correct.

There can be no doubt that the interpretation put upon a statute by the public functionaries charged with the duty of its enforcement is entitled to great respect on the part of the courts, especially after it has been acquiesced in for many years; but the learned counsel by whom, as representing the state, the said admission thus relied on as an interpretation was made, denies that it was intended to serve as such; but only as evidence of the bare fact of no demand having been made for the payment of the licenses now sued for prior to the date mentioned. He says that the tax collector had had no information before that date, so far as appears, of the said companies being engaged in said business; and that no demand would ever have been made, so far as he knows, but for the chance discovery that a steamship company and a railroad company were retailing liquors in the state without a license. Under these circumstances, the said admission cannot serve as proof of contemporaneous interpretation. And the case of State v. Comptoir National D'Escompte, 51 La. Ann. 1272, 26 South. 91, cited by defendants, where great weight was attached to the contemporaneous interpretation of the statute there involved, cannot serve as a precedent for the present case. There, the evidence showed that the party from whom the payment of a license was demanded had taken advice before engaging in the business for which the license was demanded, and had even sought this advice at the fountain head itself, from the tax collector, and had engaged in the business on the faith of this interpretation. The case, in its facts, offers no parallel with the one at bar, where the defendants engaged in the business simply on the erroneous assumption, if, indeed, they gave any thought at all to the matter, that the said statute did not apply to their case. In the present connection the following statute is of some interest (Act 148, p. 252, of 1906):

"Section 1. Be it enacted by the General Assembly of the state of Louisiana, that all claims for licenses and for additional licenses, state, town, municipal and parochial, exclusive of claims for licenses and additional licenses for the current year, shall be prescribed by three (3) years, and that no action or inaction of the state, a municipality, town or parish of this state shall stop or prescribe or debar its right to proceed for licenses or additional licenses before the day of prescription shall begin."

[5] Another contention of the defendants is that, as applicable to the bars on their ships, the said statute would be unconstitutional because violative of paragraph 3 of section 8, and paragraph 5 of section 9, of article 1 of the Constitution of the United States, giving to Congress the sole power to regulate interstate commerce, and forbidding

the states from levying duties upon interstate or foreign commerce.

That defense appears to us to be the very one that was considered, and held to be untenable, by the Supreme Court of the United States in the case of Foppiano v. Speed, 199 U. S. 501, 26 Sup. Ct. 138, 50 L. Ed. 288. The court there said:

"Since the passage of the Wilson Act of August 8, 1890, 26 Stat. 313, there is a distinction between the right to sell intoxicating liquors on vessels engaged in interstate commerce and other businesses conducted on such vessels.

"Under the provisions of that act a state may, in the exercise of its police powers, exact a license fee as a condition of the right to sell intoxicating liquor over the bar on board of a steamboat while within the boundaries of the state, notwithstanding such boat is navigating the Mississippi river and is engaged in interstate commerce.

"Such a license fee is not a tax on the boat, crew, passengers or liquor sold, nor a fee for navigating the river, the imposition of which would be an interference with the commerce clause of the Constitution, nor does it in any way violate the freedom of the navigation of the Mississippi river as guaranteed by treaties and statutes.

"The fact that the boat is personal property owned by a corporation of another state does not make it a part of the territory of that state, and exempt those thereon from the police regulations of another state in regard to the sale of intoxicating liquor while within the boundaries of the latter state."

[6] That the statute under which the license is demanded in this case is a police regulation, there can be no doubt. This court had occasion to consider that question in the case of State v. Pabst, 128 La. 778, 55 South. 352, and there said:

"The traffic in intoxicating liquors in all of its phases is admittedly within the jurisdiction of the police power; and this Gay-Shattuck Act, from its title and from its text, and indeed from its well-known history, part of the public history of this state, is manifestly intended to operate as a police regulation of the liquor traffic. The license imposed by it upon defendant's business may not be distinguishable by a single feature from an ordinary license imposed for revenue purely, but, such as it is, it seems to have been imposed by way of regulation; and it is not for this court to substitute its judgment to that of the Legislature in the matter, and say that this license does not regulate, but is merely an ordinary revenue measure."

The learned counsel for defendants ask:

"How can it be said that it is a reasonable exercise of the police power of the state of Louisiana to regulate the sale of liquor on vessels in the middle of the Mississippi river to passengers bound on long through journeys, when such vessels stop at no point within the state of Louisiana? Wherein are the health and morals of the people of Louisiana affected by the sale of liquor under such circumstances?"

This may be a good argument for showing that the statute in question has no application to defendants' ships—a contention already disposed of—but not for showing that it is not a police regulation. That the said statute is a police regulation appears from almost its every line; and that it is intended to cover the whole territory of the state, its water surfaces as well as its land surfaces, there can be no question. How far its operation may be necessary, or called for, on the ships of defendants, is a question which the Legislature will have to consider; not this court. Because a place within the state, on or off water, can police itself, and has no need of outside policing, is no reason why the police regulations of the state should be inapplicable to it. A statute of the state cannot be arrested in its operation, or nullified, by a situation being created to which the purpose of its enactment has no application. No police regulation is really necessary for the good order of barrooms within the walls of social clubs or other self-policing places, and yet such regulations do apply to these places.

Defendants contend, however, that the doctrine of Foppiano v. Speed applies only to such sales of liquors as may be made on a boat while moored to the bank; not to sales made while the boat is in transit. True, in its facts, the decision in that case might be so restricted. The reasoning of the court is broader than this, however; and the principle announced as governing it is broader, both as expressed by the court itself in the body of the decision and by the reporter of the court in the syllabus. We will add that we

have the satisfaction of knowing that, if we have erred in this appreciation of that decision, the defendants are litigants of ample means to apply to the court that rendered it to rectify our error.

[7] Another contention of the defendants is that the defendants, not having at any one time more than two ships within the boundaries of the state, ought not be made to pay more than two licenses.

Here again is a consideration addressing itself to the discretion of the Legislature, and not to the legal judgment of this court. The requirement of the statute is that as many different drinking places as there are as many licenses must be paid; and the court is left no alternative but to apply the statute.

And the same thing must be said of the interest and attorney's fees.

[8] Another contention of the defendants is that the claim for the license of the year 1911 is prescribed. The learned counsel of the state answers that the prescription applicable to license taxes is the same as that which applies to property taxes, and that the three years at which its term is fixed in the Act 148 of 1906 (transcribed at page 823 of this opinion [1]) is exclusive of the current year. That statute provides that "all claims for licenses exclusive of claims for licenses for the current year, shall be prescribed by three years." What it can mean by excluding the license of the current year from the prescription of three years, we must admit we do not understand. How could a prescription of three years apply to the license of the current year? And we must confess to the same inability to understand learned counsel when he speaks of the current year being excluded from the three-year term of the prescription. In the absence of a statute to the contrary, the prescription begins to run from the date the license is due and exigible, or, at any rate, at the latest from

---

[1] Ante, p. 446.

137 LA.—15

the date it becomes delinquent; and that date, by statutory provision and by express allegation of the state's petition in this case, is the 1st of March. The prescription for the license of 1911 must therefore be computed from the 1st of March of that year; and it had long accrued when this suit was filed on December 14, 1914.

We find no warrant for the claim of a lien and privilege upon the property of the defendants, and, in fact, the claim is not pressed by the state, nor the prayer for an injunction.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed in so far as it rejects the claim of the state for the license of 1911, and that it be otherwise set aside; and that there now be judgment in favor of the state of Louisiana and against the defendants, as follows:

Against the Southern Pacific Company in the sum of $1,400, and against the United Fruit Company in the sum of $1,600, for each of the years 1912, 1913, and 1914, with 2 per cent. per month interest on each of said sums from the 1st of March of each of said years, together with 10 per cent. as attorney's fees on the principal and interest of said debt; and that the defendants pay the costs of this suit.

O'NIELL, J., dissents.

On Application for Rehearing.

PER CURIAM. [9] The attention of the court has been called to section 28, Act No. 171, 1898, p. 420, which secures to the state a first mortgage upon the property, movable or immovable, of the delinquent, as security for the unpaid licenses and interest thereon, as amended by Act 131, 1900, p. 198, giving a lien and privilege; and to section 13, Act No. 176, 1908, p. 243, which makes all penalties, proceedings, actions, suits, procedure, remedies, liens, and privileges for the collection of licenses of other businesses applicable to

the business of retailing liquor. Our attention has also been called to the fact that two of the vessels of the United Fruit Company were not being operated by that company during the year 1912. Our former decree will be amended so as to read as follows:

It is ordered, adjudged, and decreed that the judgment appealed from be affirmed in so far as it rejects the claim of the state for licenses for 1911 from defendants, and that it be otherwise set aside; and that there now be judgment in favor of the state of Louisiana and against defendants as follows: Against the Southern Pacific Company in the sum of $1,400, for each of the years 1912, 1913, and 1914, and against the United Fruit Company in the sum of $1,200 for the year 1912, and in the sum of $1,600 for each of the years 1913 and 1914, with 2 per cent. per month interest on each of said sums from the 1st of March of each of said years, together with 10 per cent. attorney's fees on the principal and interest, with recognition of first mortgage, lien, and privilege in favor of the state upon the property, movable and immovable, of these defendants respectively, as security for said licenses; and that defendants pay the costs of this suit. Rehearing refused.